IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 19, 2012 Session

**IN THE MATTER OF DOMINIQUE L.H.**

**Direct Appeal from the Juvenile Court for Dickson County**
**No. 0811059CC      A. Andrew Jackson, Judge**

---

**No. M2012-00712-COA-R3-PT - Filed October 11, 2012**

---

This is a termination of parental rights case. The trial court terminated Father's rights based on clear and convincing evidence that Father was sentenced to incarceration for ten (10) years  while the child at issue was younger than eight (8) years of age. The trial court further found that it was in the best interest of the child for Father's rights to be terminated in order for the child to establish a permanent home with his foster family. Father appeals, arguing that the trial court erred in its best interest analysis. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Mark C. Odle, Dickson, Tennessee, for the appellant, Laterone L.H.

Robert E. Cooper, Jr., Attorney General and Reporter; Marcie E. Green, Assistant Attorney General; and Martha A. Campbell, Deputy Attorney General; for appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. Background**

The child at issue, Dominique L. H., was born on June 23, 2009 to Bobbie N. A.

("Mother") and Laterone L. H. ("Father").[1] Mother and Father were never married. This case concerns only the termination of Father's rights.

On or before June 24, 2010, the Department of Children's Services ("DCS") was called to the home of Mother to investigate a referral for environmental neglect. Upon investigation, it was discovered that Father was also living in the home with Mother's other children, despite being on the sex offender registry. Due to the filthy living conditions present in the home and the fact that the children were found in urine-soaked diapers, both Dominique and his half-brother Isaiah C.A.[2] were removed and taken into DCS custody. At the time of the removal, both Mother and Father were tested for drugs. Mother tested positive for marijuana. Father tested positive for cocaine.

Mother and Father stipulated that, at the time of the removal, the children were dependent and neglected due to the environmental conditions in the home, the fact that both children were found in urine-soaked diapers, and Mother and Father's positive drug tests. A dispositional finding of continued custody was entered on September 1, 2010 by the Dickson County Juvenile Court.

Both Dominique and Isaiah were placed in the same foster home on June 24, 2010. Together, the children were placed in a different foster home in July 2010, where they remained at the time of the trial on the termination of Father's parental rights.

Mother and Father entered into parenting plans with DCS concerning Dominique on July 8, 2010. Under the plan, Father was required to attend weekly visitation with his son, maintain a suitable home, pay any child support ordered by the court,[3] remain drug and alcohol free, and diligently seek employment.

Father returned to his previous residence with his grandparents. Father attended approximately ten supervised visits with the child. However, visitation ceased when Father was sentenced to jail for crimes he had been arrested for prior to the child's birth. Specifically, Father pled guilty to the crimes of sale of cocaine and possession of a counterfeit controlled substance and was sentenced to ten (10) years and four (4) years,

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Father is not the biological parent of this child. Thus, the termination of parental rights as to this child is not at issue in this appeal.

[3] Nothing in the record indicates that the court ever ordered Father to pay a specific amount in child support.

respectively, on December 7, 2010. On March 18, 2011, Father was sentenced to two (2) more years in prison for a violation of the sex offender registry, to which Father also pleaded guilty. All of Father's sentences were set to run concurrently. Thus, Father was sentenced to a total effective sentence of ten (10) years in prison. After Father was remanded to prison, he had no more visitation with his son. At the time Father was sentenced and remanded to prison, Dominique was approximately eighteen (18) months old.

DCS filed a petition to terminate the parental rights as to both Isaiah and Dominique. With regard to Father, the petition alleged as grounds: (1) abandonment by failure to find a suitable home; (2) substantial non-compliance with the permanency plan; (3) persistent conditions; (3) and Father's ten-year sentence. The petition further alleged that it was in Dominique's best interest that both Mother and Father's rights be terminated.

Mother's rights to both Dominique and Isaiah were terminated in a separate trial. Mother's parental rights are not at issue in this appeal. The rights of Isaiah's father were also terminated at that trial and Isaiah was ordered to remain with his and Dominique's current foster family, who wish to adopt both children.

A trial was held on DCS's petition to terminate Father's rights on March 5, 2012. Father participated through his attorney and by phone.

The only evidence presented on behalf of DCS was testimony from DCS case worker Ned Miller. Mr. Miller testified about the filthy living conditions at the home where the children were found, as well as Father's and Mother's positive drug tests. Mr. Miller testified that, although Father was required to take part in a drug and alcohol assessment, which Father completed satisfactorily, DCS did not require Father to submit to any drug testing after the children were taken into custody. However, Mr. Miller testified that, while Father always denied having done cocaine, he did admit to having the drug in his possession after the children were removed. Although not specifically required by DCS, Father also participated in some counseling with Mother, whose insurance paid for the sessions.

According to Mr. Miller, the children were placed in a foster home in Dickson County; however, when the foster mother learned that the children had lice, the children were moved to a different foster home in Clarksville, Tennessee. According to Mr. Miller, the children have lived with their current foster family continuously since July 2010. Mr. Miller further testified that the foster home was an appropriate home for two small children, and that the foster family was willing to adopt both children.

Mr. Miller was also present at a number of the visits between Father and Dominique. On some visits, Mr. Miller would transport Father, who did not have a car, to the visits. Mr.

Miller described Father's interaction with the child as "fine." On one occasion, however, Mr. Miller testified that both Mother and Father overslept and had to be awakened to attend the visit and did not seem concerned that they were missing time with their son. Mr. Miller further testified that, prior to his incarceration, Father had a difficult time finding work due to prior felony convictions, and often made money through odd jobs. Mr. Miller testified, however, that no home study was ever done on Father's home with his grandparents, where Father resided prior to his incarceration, and that he presumed that the home would be suitable for children.

Finally, Mr. Miller testified that the foster family loves, supports, and cares for Dominique, that Dominique is happy and well-adjusted living with the foster family, and that Dominique views the foster family as his family. Based on the child's adaptation to living with the foster family, Mr. Miller testified that it was in Dominique's best interest to remain with the foster family.

Several members of Father's family next testified that Father and the child had a close and loving relationship and that Father worked to provide for his son. Father's grandmother also testified that she was willing to allow both Father and the child to reside with her upon Father's release from prison.

Father next testified to the close and loving relationship between him and his son. Father denied that he was living with Mother at the time the children were taken into DCS custody; instead Father insisted that he lived with his grandparents at that time and would return to his grandparents' home upon his release from prison. Father testified that, while he had trouble keeping a steady job due to his criminal record, he worked odd jobs to provide his child with food, clothing, and diapers. Father also testified that he took the child to both doctors appointments and church.

Father next testified that he had completed a parenting class while in prison. In addition, Father completed several Bible correspondence courses, a substance abuse program, a victim impact program, and an anger management course. Father was also working toward his GED at the time of trial. Further, Father testified that he maintained a job while in prison at the Tricor Plant, where Father earns approximately $350.00 per month. Father also testified that the Tricor Plant has stated that he can continue to work for their company upon release from prison.

Finally, Father testified that he was eligible for parole in the next few years, but admitted that he could not "pinpoint" the date or even say whether he would, in fact, be released on parole. However, Father testified that he expected to be released in late 2012 or 2013, especially given that he had not been in any trouble while serving his sentence, nor

-4-

had he failed any of the drug tests administered while in prison.

At the conclusion of the hearing, the trial court orally ruled that DCS had proven, by clear and convincing evidence, that Father had been sentenced to the penitentiary for a sentence of ten (10) or more years, while the child was less than eight (8) years old. The trial court further determined that clear and convincing evidence showed that it was in the child's best interest for Father's rights to be terminated. Specifically, the trial court stated:

> [I]t appears as though [Father] did mostly what was asked of him, and then he went to prison. And since removal of the child, he's really not had a chance to parent.
>
> However, this determination has to be in the best interests of the child. And in this instance, the child came into custody when the child was one year and one day old. From that time until this time, which is over a year and a half, I have to agree with [DCS] the only family this child has ever known is with the foster parents and with his half sibling. If [Father] does or is paroled at the earliest possible date, when he got out of prison the child would be three and a half years old. And not having had any meaningful relationship with his father since one year and one day, then all this child knows are his current guardians.
>
> So to put the child in that predicament would be that when the child is three and a half, maybe four years old, maybe older, to then have [Father] get out of prison and jump through all the hoops that the State of Tennessee would want to put him through, you know, this child is going to be four, four and a half, maybe even five years old before there could be any meaningful reintegration with [Father].
>
> And if that were to happen, then he'd be disrupted from essentially the only family he knows and his half sibling. And the Court is not of the opinion that that is in the child's best interest. Accordingly, parental rights are terminated.

The trial court entered an order terminating Father's rights on March 14, 2012. An amended order was entered on April 4, 2012. The amended order states that the court found, by clear and convincing evidence, that grounds for termination of Father's parental rights were proven by showing that Father has been confined to a correctional facility as a result of a criminal act, under a sentence of ten (10) or more years, while the child was under the age of eight (8), pursuant to Tennessee Code Annotated Section 36-1-113(g)(6). Further the

trial court's amended order states:

> The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that termination of parental rights is in the best interest of the child based on the following facts:
>
> 1. The child has spent a greater portion of his life with the foster family than with the father as the child was twelve months old when brought into custody of [DCS] and was placed with the current foster family within the first month of being in custody.
> 2. Even if the father was released on parole at the earliest possible date, the child would be close to five (5) years old and would have the only family he has ever known disrupted if the father was able to regain custody upon release from incarceration.
>
> Thus the Court finds that [DCS] has proven by clear and convincing evidence that grounds for termination of parental rights exists and had proven by clear and convincing evidence that it is in the best interest of the child that all parental rights of [Father] to said child be forever terminated . . . .

Father filed a timely notice of appeal.

## II. Analysis

Father does not contest the trial court's finding with regard to grounds for termination. Instead, Father argues that the trial court erred in concluding that clear and convincing evidence supports a finding that termination of his parental rights is in the child's best interest. Because the grounds for termination in this case are relevant to the trial court's holding of best interest, we will briefly consider the grounds for termination before analyzing the best interest issue.

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*,

921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

As set out above, DCS alleged several grounds to justify termination of Father's parental rights. Only one ground must be proved by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c). Indeed, the trial court only

found that one ground was proven by clear and convincing evidence: that Father was sentenced to a prison term of ten (10) or more years while the child was under eight (8) years of age. According to Tennessee Code Annotated Section 36-1-113(g), grounds exist to terminate a parent's parental rights when:

> (6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court; . . .

The undisputed evidence at trial was that Father was sentenced to three separate sentences in prison, set to run concurrently for a total effective sentence of ten (10) years in prison. While Father asserted at trial that he was to become eligible for parole prior to the expiration of his sentence, it is well-settled that the "possibility of early parole [does not] constitute[] a sufficient basis to negate the statutorily-defined ground." *In re Adoption Of C.A.M.*, No. W2008-02003-COA-R3-PT, 2009 WL 3739447, at *5 (Tenn. Ct. App. Nov. 9, 2009). It is also undisputed that at the time of Father's sentence, Dominique was younger than eight (8) years of age. Thus, the trial court correctly found that clear and convincing evidence was put forth from DCS showing a ground for termination of Father's rights.

Father contends, however, that DCS failed to show, by clear and convincing evidence, that termination was in the child's best interest. When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), then the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d).

The term best interest is not defined by statute. With regard to best interest, Corpus Juris Secundum: Infants states:

> As a general rule, the best interests of the child concerned are an important consideration where the termination of parental rights is sought, and, in fact, have been described as

the primary or paramount consideration. . . . The same factors which show parental inability may also show that the termination of parental rights would be in the children's best interest.

43 C.J.S. Infants § 22 (2012). Thus, the grounds for termination themselves may also show that termination is in the child's best interest. In this case, Father does not contest that his ten-year sentence provides the ground for termination. This Court has held that a parent's participation in criminal activity and subsequent incarceration may evidence that it is in a child's best interest that the parent's rights be terminated:

Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

*In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005) (citing James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)). Although not discussed at length during the trial, it is clear that Father has a long history of criminal activity. At trial, Father admitted that he had previously been fired from jobs due to his prior felonies; the undisputed evidence was that Father was on the sex offender registry at the time the children were taken into DCS custody. We are unable to glean from the record what Father's past crime was that placed his name on the registry. From what we can discern from the record, however, Father's placement on the registry prevented him from residing with children other than his own. Indeed, Father later pleaded guilty to violating the terms of the sex offender registry after it was discovered that he was living with Mother and her other children at the time Dominique was taken into DCS custody. Father testified that, due to his felony record, he often had trouble maintaining a regular job. However, undisputed testimony also shows that Father is a hard worker who attempted to provide for his son by taking odd jobs.

In addition to the problems associated with the criminal activity itself, incarceration poses a further hurdle: the continued absence of a parent from the child's life. We have previously held that a lengthy delay in a child's return to the custody of its biological parent is a strong indication that termination of parental rights is in the best interest of the child, stating as follows:

This court has frequently and for a long time recognized that, as a general proposition, a child's best interest was served by termination of parental rights where, no matter the cause, there

was no reasonable expectation the child could be reunited with a parent in the near future . . . . Termination of parental rights is a prerequisite to adoption which brings with it the security and stability that is of primary importance to children.

*In re M.H.*, No. M2005–00117–COA–R3–PT, 2005 WL 3273073, at \*13 (Tenn. Ct. App. M.S., filed Dec. 2, 2005). "The alternative would be to hold a child's life in limbo for an unknown number of years on the off chance that Father might be released from prison in time to care for the [child] that he barely knows; we find this option unacceptable." *In re M.L.P.* 228 S.W.3d 139 (Tenn. Ct. App. 2007).

Father points to several facts that he argues show that terminating his parental rights is not in the child's best interest, including: (1) Father's completion of drug, parenting, and GED classes while in prison; (2) his steady prison employment, which is expected to continue after his release; (3) the close and loving relationship he had with the child prior to his sentence; and (4) his stable home with his grandparents, where he expects to return upon his release from prison. Father further contends that his testimony was undisputed that he expects to be released on parole sometime in 2013.

While we agree that Father has made significant strides both prior to his incarceration and while in prison, we note that our consideration of the best interest of the child in this case must necessarily focus on the child, rather than Father. "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194 *see also* 1 Children & the Law: Rights and Obligations § 3:9 ("Generally, a parent's 'rehabilitation' while incarcerated is not determinative in preventing termination.") As this court has said that:

> . . . the question of best interest primarily involves the rights of the child. The question of the parent's rights is relevant during this phase of the court's inquiry only to the extent that it impacts the child's best interest. When the interests of the child and the parents diverge, the best interests of the child must prevail.

*In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073 at \*10 (Tenn. Ct. App. Dec.2, 2000) (citing *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at \*9 (Tenn. Ct. App. April 25, 2005)).

The requirement that the court analyze best interest from the perspective of the child often requires that the court consider the bond between the child and the biological parent:

-10-

> Since the court is required to focus on what is best for the child, rather than to act out of sympathy for the parent, the court often has to determine if the strength of the emotional bond that exists between the parent and the child is more significant than the benefit the child will receive from termination, which is intended to free the child for adoption and a permanent, stable home.

117 A.L.R.5th 349 (2004). The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. *See* Tenn. Code Ann. § 36-1-113(i). Included in this list of factors is consideration of the bond between the child and the biological parent, as opposed to those who currently have custody of the child:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> * * *
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition; . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. ***In re Audrey S.***, 182 S.W.3d at 877.

In this case, the evidence concerning the child, rather than Father, is sparse. The only testimony presented by DCS was that of DCS case worker Ned Miller. Testimony from the child's foster parents would likely have been helpful in this case, but unfortunately, DCS chose not call the foster family to testify. However, after thoroughly reviewing the record,

we cannot conclude that the trial court erred in finding clear and convincing evidence that termination is in the child's best interest.

The evidence in the record shows that the child has lived with his current foster family since July 2010, when he was approximately one (1) year old. Thus, at the time of trial on March 5, 2012, the child had been living with his foster family for nearly two years. In addition, while Father had regular, supervised visitation with Dominique prior to his incarceration in December 2010, after he was remanded to jail he had no visits with his son. Father does not dispute either the trial court's or DCS's failure to continue visits once Father was remanded to prison. Thus, at the time of trial, the child had not only no meaningful relationship with Father for over a year, he had no relationship with Father whatsoever. Father admitted at trial that the time he spent with his son was less than the time his son has spent with the foster family. Consequently, Father's lack of contact or meaningful relationship with his son support termination of his parental rights.

While Father insists that he will be eligible for parole in the next few years, Father was unable to state with specificity when he would be released or whether he would be released early at all. "[P]arole eligibility does not equate with release, but only with the possibility of release." *In re C.A.M.*,2009 WL 3739447, at *5. The trial court found that, even if Father were to be released at the earliest possible date, it could be years before Father was fully reintegrated into the child's life. The trial court further found that even if reintegration is possible after Father's release, the child's life with the only family he has ever known would be disrupted, which would necessarily have a detrimental effect on the child. The evidence in this case does not preponderate against these findings.

This Court has previously held that termination is in the best interest of the child due to a parent's incarceration even when the parent has the possibility to be paroled in the near future. In *In re Adoption Of C.A.M.*, No. W2008-02003-COA-R3-PT, 2009 WL 3739447 (Tenn. Ct. App. Nov. 9, 2009), the Court concluded that it was in the best interest of the child to terminate an incarcerated father's rights even when he alleged that "he 'has made many positive adjustments in both conduct and condition that will serve him well upon his release from prison in the near future.'" *In re C.A.M.* 2009 WL 3739447, at *7. The Court concluded however, that the factors nevertheless weighed "heavily in favor of termination" because the father "has no home to offer [the child], [] will probably remain incarcerated for the foreseeable future, and his prospects for establishing such a home after he is released are uncertain at best." *Id.* In another case involving an incarcerated parent, *In re T.M.G.*, 283 S.W.3d 318 (Tenn. Ct. App. 2008), this Court concluded:

> In the present case, it is unknown when Father will be released
> from prison and then how long after his release before he would

be able to care for the Child, assuming he ever gets to that point. Although Father has maintained some contact with the Child, we are unable to describe 10 visits over the course of several years as "regular."

The Court further described the child's adaptation to living with her great-grandmother, who had been her caretaker for much of the child's life and found that a change in caretakers would have a detrimental effect on the child. Thus, the Court concluded that termination of the father's parental rights was in the child's best interest. *Id.* In yet another case where an incarcerated parent argued that he would be released from prison well before his sentence expired, ***In re Darion X. Y.***, No. M2012-00352-COA-R3-PT, 2012 Tenn. App. LEXIS 689 (Tenn. Ct. App. Sept. 27, 2012), this Court held that termination of the father's parental rights was in the child's best interest. Specifically, the Court concluded that termination was appropriate in order to allow the child to remain with his half sibling, with whom the child had a strong relationship, and be adopted by the pre-adoptive family where both children had been placed, instead of waiting for "the uncertainty of [f]ather's situation" to resolve. *Id.* at *13.

In this case, Father is also unable to state his exact release date or to say conclusively that he will be released from prison early. In addition, it is also undisputed that Father has had no contact with the child for more than a year prior to trial. While Father's lack of visitation is due to his incarceration, his incarceration, and consequent lack of visitation is a "direct result of Father's choices." ***In re C.A.M.***,2009 WL 3739447, at *8. Further, while somewhat lacking, the evidence shows that the child considers his foster parents, along with his step sibling, to be his family. The undisputed evidence further shows that the foster family loves, cares and supports the child and that the child is well-adapted to their custody. Additionally, the foster family hopes to adopt both Dominique and his half brother, whom Dominique has considered his sibling his entire life. Although the parent's sentence in ***In re Darion X. Y.*** is somewhat longer than Father's in this case, this case involves the same competing interests of allowing the child the stability and certainty associated with termination and subsequent adoption as opposed to the uncertain circumstances of a parent who may or may not be released early from prison or be able to adequately parent his child. ***See In re Darion X. Y.***, No. 2012 Tenn. App. LEXIS 689, at *13. From our review of the record, to postpone a permanent placement with the foster family, who desires to adopt the child, in hopes that Father would soon be released from prison and also be able to provide a safe and stable home for the child is simply not in the child's best interest. Instead, we agree that termination of Father's parental rights is in the child's best interest because it allows Dominique to remain with his half sibling and to be adopted by the only family he has ever known. *See id.* (holding that in considering the best interest of a child who resides with a half sibling in the same foster home, "keeping the children together is appropriate and

in the best interest of both children"). From the totality of the circumstances, we conclude that clear and convincing evidence exists to support the trial court's conclusion that termination of Father's parental rights is in Dominique's best interest.

The judgment of the Juvenile Court of Dickson County is affirmed and this cause is remanded for any further proceedings as may be necessary. Costs of this appeal are taxed to Appellant Laterone L. H., who is proceeding as a pauper, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE