# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 4, 2016

## IN RE: KNOX C.

**Appeal from the Juvenile Court for Jefferson County**
**No. 15-00491     Dennis "Will" Roach, II, Judge**

**No. E2016-00768-COA-R3-PT-FILED-NOVEMBER 3, 2016**

Shane L.B. ("Father") appeals the judgment of the Juvenile Court for Jefferson County ("the Juvenile Court") terminating his parental rights to the minor child, Knox C. ("the Child"), after finding and holding that grounds for terminating Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(6) were proven by clear and convincing evidence and that it was in the Child's best interest for Father's parental rights to be terminated. We find and hold that the evidence in the record on appeal does not preponderate against the Trial Court's findings made by clear and convincing evidence that grounds were proven to terminate Father's parental rights to the Child and that the termination was in the Child's best interest. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and BRANDON O. GIBSON, JJ., joined.

Kimberly R. Grace, Jefferson City, Tennessee, for the appellant, Shane L.B.

Herbert H. Slatery, III, Attorney General and Reporter; and Brian A. Pierce, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born drug-exposed in November of 2014. Father was incarcerated at that time. After spending approximately 45 days in the hospital, the Child was placed in a foster home. The Child has remained in foster care continuously since that time.

In June of 2015, the State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Father and Megan C. ("Mother") to the Child. Mother's parental rights to the Child were terminated in December of 2015 and are not at issue in this appeal. The case proceeded to trial with regard to Father's parental rights to the Child in February of 2016.

Father testified at trial that he has been incarcerated since March 25, 2014 and is serving a twelve year sentence for aggravated robbery. Father first was incarcerated in Knox County and then was moved to Northwest Correctional Complex. Father received three separate convictions for aggravated robbery and was sentenced to twelve years for each conviction with the sentences to run concurrently. Father also was convicted of aggravated burglary and received a six year sentence to run concurrently with his other sentences. Father admitted that he had prior criminal convictions including a conviction for simple possession in March of 2012, a conviction for possession of a firearm during commission of a felony in April of 2012, a conviction for simple possession in April of 2012, and a conviction for aggravated burglary in November of 2012.

Father testified that he expects to be released from prison in six years, somewhere between 2020 and 2021. Father testified that upon his release he could live with his sisters, but he instead intends to go to a halfway house "that would have a better structure . . . ."

When asked what he has done during his incarceration in an attempt to better himself, Father stated:

> As of right now, I'm in adult youth offenders, ages 18 to 25, it's a post social life skills. T-com (phonetic), which is if you have a drug problem, they help you with that. Parenting classes, training classes, all kinds of GED, vocational and one program is 18 to 24 months to complete. And I've been in there 16 months. . . . And also, we're isolated from the different common - - we can't have any contact with other inmates. We have our own pod. And I've been isolated 16 months in the same pod.

2

Father testified that he has completed anger management, mental health service, parenting classes, and his GED. Father testified: "while I was in class, I got Student of the Month for turning in all my work and completing all my tests I took." Father stated that he has not failed a drug test nor has he committed a crime while in prison. Father also testified that he works as a chaplain's assistant for the chaplain at the prison church. He admitted that he makes an income that "pays all [his] court costs, bonds." When asked if he had made an effort to pay support for the Child from his income, Father stated: "If I wanted to, I could. I wouldn't have an address to do it. I wouldn't know how to go about that."

Father never even has seen the Child and admitted that he has no relationship with the Child. Father admitted that being incarcerated severely limits his ability to establish a relationship with the Child or be a parent to the Child. Father admitted that if he gets out at the earliest projected date, the Child, who was less than two years old at the time of trial, will be approximately seven years old at the time of Father's release.

Father testified that he wants the Child to be placed with Melissa W., who has custody of Father's daughter, until Father is released from prison. Father testified that he maintains a relationship with his daughter. He wants the Child to get to know his sister and for the two to be a part of one another's lives.

Teresa Gray, the DCS caseworker who has worked on the Child's case since the Child was released from the hospital after his birth, testified at trial. Ms. Gray testified that she has visited the foster home where the Child currently resides. At the time of trial, the Child had been in this foster home for approximately five or six months. When asked about the relationship between the Child and the foster family, Ms. Gray stated: "Very good. They are good people. It's a - - he's the only child and so he's a pretty spoiled little boy. You know when they first got him he had some medical issues, but he seems to be growing out of those. And he's doing really amazing." Ms. Gray testified that the Child's current foster home is a pre-adoptive home. When asked if the Child seemed fond of the foster family, Ms. Gray stated: "Oh, yeah, very much. He won't let me hold him anymore." Ms. Gray believed that a change in caretakers would be detrimental to the Child and that it was in the Child's best interest for Father's parental rights to be terminated.

The current foster home where the Child resides is the second foster home in which the Child has resided. Ms. Gray admitted that the first foster home initially was considered to be a pre-adoptive home, but ceased to be considered a pre-adoptive home because "[t]he foster family reported that they are not a pre-adoptive home." Ms. Gray stated: "Because of [the Child's] many health issues the family had changed its mind - - the first family. And they decided not to be a pre-adoptive home." Ms. Gray testified

that the Child still sees the first foster family. She explained that the first foster family and the current foster family are related to one another. Ms. Gray stated that the Child "still attends birthday parties with the first foster family. He still attends family functions, family reunions, and I think they do pool parties together. He still has a connection with the first family."

Ms. Gray was asked about what she did to assist Father, and she stated that she sent a letter to him and attempted to visit him in jail in Knoxville but was unable to do so because Father had been moved to another prison. Ms. Gray received a letter from Father dated April 22, 2015, and she responded by sending Father another letter. Ms. Gray also attempted to visit Father at the Northwest Correctional Complex. The prison, however, was on lock-down, and she was not allowed to visit. Ms. Gray admitted that she never attempted to bring the Child to visit Father in prison.

Melissa W. testified at trial. She stated that she knows Father through "his kid's mother," and that she currently has custody of Father's daughter. Ms. W. stated that she and Father are friends and that Father calls her "Mom." Ms. W. stated that she has known Father for approximately six or seven years and that she has maintained contact with Father during his incarceration by telephone calls and letters.

Ms. W. testified that Father sends cards to his daughter and that Father shows an active interest in her life. Ms. W. stated: "He asks for pictures, anything she colors, he wants it. Anything she writes, he keeps it. And then he'll write the same thing back, you know. If she puts a handprint, he puts a handprint. When he sends it back, it has a handprint of his." Ms. W. was asked if she had taken Father's daughter to visit Father in prison, and she stated: "No, I am not allowed. . . . Because the Judge said when I've got the kids they - - he's not allowed to see the girls, supervised or unsupervised, without coming back to court first."

Ms. W. testified that when the Child was born she visited him "every day" while he was in the hospital. Ms. W. stated that she would be willing to take custody of the Child. Ms. W. was asked if she had filed a petition seeking to obtain custody of the Child, and she stated:

Well, I didn't file a petition for custody from the Judge when they said I could get him. They wanted me to go through foster care. I've not done foster care with any of his siblings. I didn't want to do that.

But, then when they came to the house to do all the stuff, they said that I didn't have enough room. Well, I've moved since then and I've bought a house. And income was an issue, but we take care of the kids we

have. They've got everything they need. . . . We had a home study. It was right after he was born. Not too long after he was born, when they tried to place him, because I was going to see him every day. And then they denied the home study - - I mean denied the foster system and then they said I couldn't come see him anymore. I wasn't allowed. . . . And what I understood was everybody had already lost their parental rights and he was being adopted. That's what they led me to believe.

Ms. W. was asked how many children she has in her household, and she testified that she and her husband have three of the Child's siblings and their cousin and her own grandson. Only one of the Child's siblings is Father's child. The five children in Ms. W.'s household are all between the ages of three and fourteen. Father's daughter is the three year old.

After trial the Juvenile Court entered its order on March 16, 2016 terminating Father's parental rights to the Child after finding and holding, *inter alia*:

> **2. Ten-Year Sentence.** The Court finds that this ground has been proven against [Father] by clear and convincing evidence. [Father] received a 12-year sentence on October 12, 2014, during which time the mother was in the final stage of her pregnancy with the minor child, who was subsequently born nearly one month later on November 11, 2014. The Court concludes that, because [Father] received a sentence of 10 years or more and the minor child was younger than 8 years old at the time that [Father] received the sentence, this ground has been proven by clear and convincing evidence pursuant to Tenn. Code § 36-1-113(g)(6).
>
> **3. Best Interest.** The Court finds that the facts and circumstances in this case warrant a finding of best interest. [Father] received a 12-year sentence on October 12, 2014. The Court heard testimony from a friend of [Father, Melissa W.], who, among other things, stated that she would be willing to foster the minor child until his release. The testimony of [Ms. W.] regarding placement of the child was objected to by the Department during the termination hearing, and although lacking in probative value, is hereby admitted. The evidence has shown that [Father] desires for his child to be placed with [Ms. W.] during the intervening time period prior to his release. However, [Father] will not be able to provide for a permanent home for the child until after his release, which has been shown to be many years away. Although the evidence has shown that [Father] is interested in developing a relationship with his minor child, to date [Father] has never met the minor child and does not have a relationship with the minor child. The evidence has shown that the minor child has been in a healthy pre-adoptive home for

several months. In the opinion of the Court, and in conformity with the spirit of Tennessee case law and statutes favoring permanency and stability, the Court finds by clear and convincing evidence that it is in the best interests of the minor child, pursuant to Tenn. Code § 36-1-113(i), that the parental rights of [Father] be terminated.

Father appeals the termination of his parental rights to the Child to this Court.

## Discussion

Although not stated exactly as such, Father raises one issue on appeal: whether the Juvenile Court erred in finding that it had been proven by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. "Few consequences of judicial action are so grave as the severance of

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

6

natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

8

with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Father does not contest that clear and convincing evidence was shown supporting grounds for terminating Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(6). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *Id.* at 525-26 (footnote omitted).

The Juvenile Court found that clear and convincing evidence had been proven to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(6), which provides that grounds for termination exist when: "The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court." Tenn. Code Ann. § 36-1-113(g)(6) (2014). The evidence in the record on appeal shows without question that Father was convicted of a crime under a sentence of more than ten years and the Child was under the age of eight at the time the sentence was ordered. As such, we find no error in the Juvenile Court's determination that grounds to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(6) were proven by clear and convincing evidence.

As grounds for termination were proven by clear and convincing evidence, we next must consider the issue raised by Father regarding whether the Juvenile Court erred in finding that it had been proven by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest. When making a determination regarding best interest, a trial court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i). As this Court explained in *In re Jaceton B.*:

> Once a ground for termination has been established, the ultimate goal of the proceeding is to ascertain and promote the child's best interests, and to achieve that end courts must consider all relevant factors. *See In re Audrey S.*, 182 S.W.3d at 877; *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The child's best interest must be viewed from the child's, rather than the parent's, perspective. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Ultimately, the relevancy and weight given to each factor depends on the unique facts of each case. *In [re] Audrey S.*, 182 S.W.3d at 878. Depending on the circumstances of the particular parent and particular child in question, the consideration of one factor may determine the outcome of the analysis. *Id.* (citing *White*, 171 S.W.3d at 194).

> The General Assembly has provided a list of factors for courts to consider when determining the best interests of a child. *See* Tenn. Code Ann. § 36–1–113(i). This list is not exhaustive, and a trial court is not required to find the existence of each enumerated factor before it determines that terminating a party's parental rights is in the best interest of the child. *In re M.A.R.*, 183 S.W.3d at 667. Instead, a court is required to weigh both the factors listed in Tenn. Code Ann. § 36–1–113(i) and any

10

other relevant factors to determine whether terminating a parent's rights is in the child's best interest. *Id.*

Other relevant factors may include the grounds for termination themselves, especially when those grounds involve a long prison sentence. *See In re Dominique L.H.*, 393 S.W.3d at 717 (citing 43 C.J.S. Infants § 22 (2012)). Incarceration creates a lengthy delay in a parent's ability to take custody of his child, and such a delay is a strong indication that termination is in the child's best interests. *See id.* at 718, 720. Father's incarceration and the attendant delay in his ability to care for Jaceton obviously affect Jaceton's best interest. As a result, it is proper to consider this factor along with other relevant factors in the context of the best interests determination. *See In re Dominque L.H.*, 393 S.W.3d 710, 717–20 (Tenn. Ct. App. 2012); *In re Darion X.Y.*, No. M2012–00352–COA–R3–PT, 2012 WL 4474123, at *4 (Tenn. Ct. App. Sept. 27, 2012).

*In re Jaceton B.*, No. M2014-01580-COA-R3-PT, 2015 WL 1517779, at **3-4 (Tenn. Ct. App. March 30, 2015), *no appl. perm. appeal filed*. The facts in *In re Jaceton B.* are in several relevant respects similar to the facts in the case now before us. In both cases the child at issue was removed from the mother's custody upon birth due, at least in part, to drug exposure, and the father in each case had been incarcerated for all of the child's life and was a stranger to the child. We stated in *In re Jaceton B.*:

Here, the trial court found that terminating Father's parental rights was in Jaceton's best interests based on both statutory and non-statutory factors. The trial court first found that Father did not have a meaningful relationship with Jaceton. *See* Tenn. Code Ann. § 36–1–113(i)(4). Indeed, the evidence in the record establishes that Father has been incarcerated for all of Jaceton's life. From Jaceton's perspective, Father is a complete stranger, and in such cases this factor alone may be sufficient to demonstrate that terminating a parent's rights is in the child's best interests. *See White*, 171 S.W.3d at 194–95.

The trial court also found that, as the result of his own decisions, Father was currently incarcerated and unable to care for Jaceton. The trial court further found that while Father was scheduled to have a parole hearing in May 2016, release at that time was not certain. Father's incarceration creates a lengthy delay in his ability to take custody of and care for Jaceton. During this delay, Jaceton will be denied a sense of permanency or stability while he waits to see if Father, a man he does not know, is released from prison. Even if Father is released in May 2016,

11

Jaceton will have doubled in age from the time of the termination hearing to the time of Father's release. Such a significant lapse in time strongly indicates that it is in Jaceton's best interest to terminate Father's parental rights. *In re Dominque L.H.*, 393 S.W.3d at 718; *see In re M.L.P.*, 228 S.W.3d 139, 148 (Tenn. Ct. App. 2007) ("The alternative [to terminating parental rights] would be to hold a child's life in limbo for an unknown number of years on the off chance that Father might be released from prison in time to care for a daughter he barely knows; we find this option unacceptable.").

*Id.*, at \*4.

*In re Jaceton B.* is not the only case in which this Court has discussed the fact that long-term incarceration may weigh heavily in favor of termination when making a determination regarding the best interests of a child. In *In re Dominique L.H.* this Court stated:

In addition to the problems associated with the criminal activity itself, incarceration poses a further hurdle: the continued absence of a parent from the child's life. We have previously held that a lengthy delay in a child's return to the custody of its biological parent is a strong indication that termination of parental rights is in the best interest of the child, stating as follows:

This court has frequently and for a long time recognized that, as a general proposition, a child's best interest was served by termination of parental rights where, no matter the cause, there was no reasonable expectation the child could be reunited with a parent in the near future . . . . Termination of parental rights is a prerequisite to adoption which brings with it the security and stability that is of primary importance to children.

*In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at \*13 (Tenn. Ct. App. Dec. 2, 2005). "The alternative would be to hold a child's life in limbo for an unknown number of years on the off chance that Father might be released from prison in time to care for the [child] that he barely knows; we find this option unacceptable." *In re M.L.P.*, 228 S.W.3d 139 (Tenn. Ct. App. 2007).

*In re: Dominique L.H.*, 393 S.W.3d 710, 718 (Tenn. Ct. App. 2012).

12

Although, in the case now before us, Father has made significant progress toward bettering himself while incarcerated, "[t]he child's best interest[] must be viewed from the child's, rather than the parent's perspective." *In re Jaceton B.*, 2015 WL 1517779, at *3 (quoting *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)).  The evidence in the record on appeal concerning the Child is sparse, at best, but we do know that the Child is in a pre-adoptive foster home and is doing well.  We also know that although this is the second foster home in which the Child has resided, the Child still has contact with the first foster family.  Furthermore, we know that the Child never has met Father and has no relationship with Father whatsoever.

Father argues in his brief on appeal that the possibility of his parole should be taken into account because "a parent with a reduced sentence has the ability to re-enter society and acquire the stability and permanency for his or her child or children."  As this Court has noted, however, eligibility for parole is merely a possibility for release, not a certainty.  *In re Dominique L.H.*, 393 S.W.3d at 719.  Furthermore, the evidence in the record on appeal shows that Father will remain incarcerated after the trial in this case for several years to come, even in a best case scenario involving an early release.  Then, upon release it would take some additional time before Father even possibly could be in a position to assume custody and care of the Child.  The Child was younger than two years old at the time of trial, and Father admitted that even if Father is released at the earliest projected date, the Child will be approximately seven years old at the time of Father's release.  The evidence in the record on appeal shows that Father's only suggestion for who could care for the Child in the interim, *i.e.,* Ms. W., already has been ruled out as a potential foster home by DCS.  Thus, if Father's parental rights are not terminated, the Child will remain in foster care in limbo for years to come waiting for Father, a man who is a stranger to the Child.  We find this prospect unacceptable given both the relevant Tennessee statutes and case law.   We find and hold that the evidence does not preponderate against the Juvenile Court's findings made by clear and convincing evidence and its ultimate conclusion that it is in the best interest of the Child for Father's parental rights to be terminated.

While courts must  be careful not to treat a parent's long term incarceration as a sole conclusive factor as to a child's best interest, it is an important factor to be considered in light of all other facts relevant to that specific child's best interest.  The Juvenile Court correctly did that, and so have we.

As grounds for the termination of Father's parental rights to the Child were proven by clear and convincing evidence, and it also was proven by clear and convincing evidence that it is in the Child's best interest for Father's parental rights to be terminated,

we find no error in the Juvenile Court's March 16, 2016 order terminating Father's parental rights to the Child.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Shane L.B.

_____
D. MICHAEL SWINEY, CHIEF JUDGE