FILED
05/16/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 1, 2022 Session

**IN RE KHALIL J.**

**Appeal from the Juvenile Court for Davidson County**
**No. 2018-000449, PT253972      Sheila Calloway, Judge**

_____

**No. M2021-00908-COA-R3-PT**
_____

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that three grounds for termination as to both mother and father were proven: (1) persistent conditions; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility. The juvenile court also found that termination was in the best interests of the child. Both the mother and the father appeal. We reverse the juvenile court's finding of persistent conditions as to the mother and the father, but otherwise affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

James A. Rose, Nashville, Tennessee, for the appellant, Dusty L. H.

Sharlina Mack, Nashville, Tennessee, for the appellant, Henry D. J.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Bruce Radek, Nashville, Tennessee, Guardian Ad Litem.

**OPINION**

**I.      FACTS & PROCEDURAL HISTORY**

This case involves the termination of the parental rights of Dusty L. H. ("Mother") and Henry D. J. ("Father") as to their child Khalil. Prior to the Tennessee Department of Children's Services ("DCS") involvement with this child, Mother already had a history with DCS. Mother was removed from the custody of her biological mother at a young age and adopted by her aunt and uncle. She had a difficult childhood, endured harsh punishments, and was sexually abused by her uncle when she was fifteen years old.[1] A few years later, Mother gave birth to her first child as a teenager. When that child was two weeks old, Mother claims she "barely tapped" him on the bottom after becoming frustrated from his crying. The child was then removed from her custody due to concerns about her ability to parent and was placed in the custody of the maternal great-grandmother (Mother's step-grandmother). Mother's second child was also placed in the custody of the maternal great-grandmother after the child was adjudicated abused and Mother failed to complete the permanency plan requirements in that case.[2] Father also had a difficult childhood: he did not have much of relationship with his father and was physically abused as a child.

In 2017, Mother and Father met and decided to have a child together. During this time, Father was arrested for physically abusing Mother in October 2017 while she was pregnant. However, the case against Father was dismissed because Mother did not appear for the hearing. Regarding that particular incident, Mother stated that Father put his hand around her neck, attempted to strangle her, and caused her to almost black out. Father reportedly "punched and scratched her face several times, got on top of her, grabbed her by the neck with his hand and choked her to the point that she had a hard time breathing and she thinks she may have passed out at some point." Father admitted to the abuse claiming that he did it "because she cheated on me and, on top of that, she lied. Telling me I'm cheating on her, and I wasn't." On other occasions, Mother stated that Father choked her, hit her in the head with a lamp, attempted to cut her with a broken plate, and threatened her with a broken spatula. She stated that he also verbally abused her.

On January 29, 2018, Mother gave birth to her third child—Khalil. Two days later, DCS became involved after receiving a referral from the maternal great-grandmother alleging lack of supervision. The referral detailed concerns about the child being discharged into Mother's care due to the allegations of physical abuse involving her two older children. On February 1, 2018, the child was placed in DCS custody due to substantial risk of harm and has remained in foster care since that date. The juvenile court entered a non-exigent removal and custody order for DCS and directed DCS to file a petition. While at the hospital, a child protective services assessor ("CPSA") spoke with

---

[1] Mother provided details of physical and sexual abuse by her aunt and uncle in her psychological assessment in November 2019. In her testimony, she described the abuse as a "nightmare," but she explained that she was able to talk about the abuse with her therapist.

[2] As a result of DCS's involvement with her second child, Mother completed a parenting/psychological assessment in 2012 and was diagnosed with unspecified anxiety disorder and mild intellectual disability with an overall IQ score of 59. Mother had also consistently received medication management services from Mental Health Cooperative since at least 2016.

the parents. The CPSA was able to learn that Father was using marijuana prior to the child's birth; both parents were on disability; and the parents had a history of domestic violence. Afterward, DCS filed a petition for custody with a request for emergency removal and request to set child support. In its petition, DCS alleged that the child was dependent and neglected stating that "[t]he alleged perpetrator(s) of such dependence/neglect is/are [Mother] . . . for a persistence of conditions resulting from failing to complete prior required tasks on a permanency plan, mental health issues, domestic violence and [Father] for exposure to domestic violence and drug exposure." The juvenile court entered an emergency protective custody order placing the child in the temporary care and custody of DCS. The child was four-days-old when he was placed in a foster home.

After the removal of their child, Mother and Father went their separate ways. Mother then moved around from home to home, and Father moved back in with his father figure. The initial permanency plan was developed and ratified in March 2018. Mother's responsibilities were as follows:

1. Comply with services;
2. Participate in one-on-one parenting sessions geared to a parent with intellectual disability;
3. Comply with medication management, continue to work with case management, and work with the family service worker ("the FSW") to set up counseling regarding domestic violence;
4. Maintain safe and stable housing and a legal source of income to provide for herself and the child;
5. Maintain contact with DCS and notify DCS of any changes in phone number, address, or other contact information; and
6. Attend all medical appointments for the child if possible and notify DCS within one week if transportation to appointments was needed.

Father's responsibilities were as follows:

1. Attend all medical appointments for the child if possible and notify DCS within one week if transportation to appointments was needed;
2. Follow recommendations from parenting assessment or participate in one-on-one parenting sessions with Mother if available;
3. Maintain safe and stable housing and a legal source of income to provide for himself and the child;
4. Maintain contact with DCS and notify DCS of any changes in phone number, address, or other contact information;
5. Participate in anger management and follow recommendations; and
6. Follow recommendations from his alcohol and drug ("A&D") assessment.

In July 2018, the juvenile court held a hearing on DCS's petition. After the hearing, the juvenile court found the child dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(F) and (G) due to Mother's ongoing pattern of domestic violence and mental health issues and Father's domestic violence with Mother and drug use. However, the juvenile court did not enter its order until April 2021, nearly three years later and just two days before the hearing on the petition for termination of parental rights.[3]

In March 2019, the parents completed functional parenting assessments with Athena Consulting & Psychological Services ("Athena"). Both Mother's and Father's assessments recommended that they receive parenting education. In addition to parenting education, Father's assessment recommended supervised visitations with an educational component that would include feedback about his behavior with the child in order to improve their relationship. The second permanency plan was developed in August 2019 and ratified in October 2019. In addition to her previous responsibilities, Mother was required to:

1. Maintain employment, provide proof to DCS, and update DCS within ten days of any changes;
2. Sign a release so that the FSW could get records of her participation at MHC;
3. Comply with all scheduled visits and notify DCS within twenty-four hours of any visits if she was unable to attend;
4. Maintain a bonded relationship with the child; and
5. Participate in a psychological assessment and follow recommendations.

In addition to his previous responsibilities, Father was required to:

1. Provide proof of stable employment to DCS and notify the FSW within ten days of any changes;
2. Complete a psychological assessment and follow recommendations;
3. Provide proof of residency to DCS and notify the FSW within ten days of any changes; and
4. Continue to visit with the child and notify DCS within twenty-four hours of any visits if he was unable to attend.

In October 2019, the FSW explained the contents of the DCS form setting forth the criteria and procedures for termination of parental rights to the parents. Father signed the form, but Mother refused. In November 2019, the parents completed their psychological assessments with Athena. Mother's assessment recommended behavioral-oriented therapy consisting of behavioral activation for depression, deep breathing/meditation for anxiety, anger management, and a focus on the relationship between her behaviors and their consequences. The assessment noted that Mother admitted to using cocaine and marijuana in the past. Father's assessment recommended psychotherapy to address his symptoms of

---

[3] The record is unclear as to why there was this much of a delay.

depression and assist with coping with stress. His assessment also recommended an evaluation with a psychiatric medication provider to determine if medications were an appropriate treatment option for his depression.

On November 26, 2019, DCS filed a petition to terminate the parental rights of the parents and for full guardianship. The petition noted that Mother was currently renting a room in a halfway house and that Father was currently homeless and sleeping in his car. DCS alleged four grounds for termination: (1) substantial noncompliance with a permanency plan; (2) persistent conditions; (3) mental incompetence; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. Additionally, DCS alleged that termination of parental rights was in the best interests of the child. After the petition was filed, Father completed both his anger management and psychotherapy sessions. In March 2020, visits transitioned to virtual due to COVID-19. Mother consistently participated in the virtual visits, but Father only participated in one because he was frustrated and upset that he did not get to engage with the child.

The third permanency plan was developed in July 2020 and ratified in October 2020. In addition to her previous responsibilities, Mother was required to:

1. Refrain from illegal activity in the home and not allow other people to engage in illegal activity in the home;
2. Maintain mental health services and follow recommendations from therapy and medication;
3. Maintain counseling; and
4. Continue to receive her SSI income and notify DCS of any changes.

In addition to his previous responsibilities, Father was required to:

1. Address his mental health needs and follow recommendations from his assessment;
2. Refrain from illegal activity in the home and not allow other people to engage in illegal activity in the home;
3. Address drug use if it becomes an issue again; and
4. Complete a mental health assessment.

Father completed an assessment with Dr. Janie L. Berryman in April 2021. In her report, Dr. Berryman stated that her diagnostic impressions of Father were "[m]ild to moderate intellectual disability" and "[d]epressive disorder from prior evaluation." Among other things, Dr. Berryman recommended that Father would need assistance if he were to have any type of visitation with the child because of "intellectual deficits." She also did not believe that there was a positive bond between Father and the child. Mother filed an answer to the petition for termination of her parental rights just before the trial on the petition took place. In her answer, she denied the grounds asserted by DCS and denied that it was in the best interests of her child for her parental rights to be terminated.

- 5 -

The juvenile court held trial on the petition for termination of parental rights on April 8, 2021, April 9, 2021, and June 21, 2021. On the first day of hearings, both of the parents testified. Mother began her testimony by stating that she had made mistakes with her two older children, "but this was a chance to rethink the mistakes [she] made" in the past. Mother had two older children who were removed from her custody in the past and placed in the care of the maternal great-grandmother. Her third child, Khalil, never went home with her from the hospital after he was born because DCS became involved. She stated that the child was removed from her custody because of a "lack of supervision," but she did not quite understand why. She then stated that a petition for custody was filed, a trial was held on the petition, and she had a chance to testify at that time. She explained that the court's finding was based on both her mental health and domestic violence issues.

After the child was taken from her, Mother participated in a parenting inventory in March 2018. She explained that she had concerns about how to physically discipline the child, but she had come to the realization that there were better ways to discipline him without having to use physical contact such as grounding and taking things away from the child. She hoped to have the opportunity to learn and practice those non-physical means of discipline. Mother also participated in a psychological evaluation in November 2019. She admitted that she had an anger problem, but she explained that it was because of what she had experienced as a child. She also explained that she took medication, such as Abilify, heartburn medicine, and iron pills for anemia. She was diagnosed with ADHD at a young age and took Abilify to improve her mood and ability to focus. She was currently on the medication and stated that there were no breaks in her medication recently. Mother testified that she completed her parenting education, anger management, and domestic violence sessions. She was currently unemployed; however, she had a source of income through her social security. She also stated that she was previously incarcerated for nine months before the child was born. However, she did not have any probation related to that incarceration at this point and had not been in jail or received any criminal charges since then.

Mother stated that when she was in a relationship with Father, he was abusive. They lived in an apartment that belonged to Father's "mom" and "dad." She explained that Father's "mom" and "dad" were not his biological or adoptive family, but he considered them family. After several episodes of domestic violence, some of which occurred while she was pregnant, she grew tired of the abusiveness and ended the relationship with Father. She stayed with an ex-boyfriend for a time, but when she gave birth to the child, she stated that she was back with Father again. She explained that she wanted to try to work things out with Father for the sake of the child, but the abuse continued. Thus, she left their apartment and moved into a motel with a friend. Afterward, she moved around from home to home and was unable to stay in one place for very long. Ultimately, she ended up on the streets living in a tent, but she was recently able to stay at a motel after receiving her stimulus check. She stated that she had been working on securing housing through Urban

- 6 -

Housing since November 2020, but was homeless at the time. She was trying her best to secure housing, but she explained that it was like "pulling teeth" getting Urban Housing on the phone and that she was having trouble getting a copy of her birth certificate.

In regard to visits, Mother testified that she did not miss any visits. Mother participated in all of her in-person visits before COVID-19 except for a few instances that were unavoidable. During COVID-19, she also participated in the virtual visits. She stated that the therapeutic worker would inform her when the visits were so she could get up early and go to Kroger to use its wi-fi. She explained that she did not have a phone for a period of time because she was unable to pay her phone bill. She was able to get a phone recently, but the only way she could use it was around wi-fi. Therefore, she had to walk an hour just to put herself in the position to be able to participate in the virtual visits. This situation led to Mother succumbing to heat exhaustion during the summer of 2020. During one particular episode, Mother was so hot she became weak, an ambulance was called, and she was given fluids for rehydration. She admitted that DCS helped her out with bus passes, but she was unable to remember if she ever contacted DCS to inform them that she needed a bus pass during the time she succumbed to heat exhaustion. Mother stated that she was very active with the child at in-person visits: she played with him, gave him snacks, and read to him. She also put him in her lap, rocked him, and allowed him to fall asleep when he was sleepy. She explained that there were times when he did not want to leave her and Father, but they would calm him down and tell him it was okay. Mother would tell him that she loved him. At the virtual visits, she stated that she talked with him, asked him questions, and would be involved. She explained that she would try to make conversation and interact with him even if he was not paying attention to her. Mother stated that she had not been able to visit with the child in person during COVID-19; the visits were all virtual at that point.

Mother believed that the foster parents were partly responsible for taking her child away, but she mainly held the maternal great-grandmother responsible. She reiterated that the child was taken from her for a lack of supervision from her understanding, but also because she did not complete a requirement on her permanency plan pertaining to her second child. When asked if she had ever threatened DCS or threatened to harm herself, Mother clarified that she never threatened anyone at DCS with any type of violence. Rather, she had said that if her child was taken from her she would sue them. She explained that she specifically said, "over my dead body." She stated that there was no help DCS could offer her to cope if her child was taken away. She said, "I've had too many kids ripped away from me. I'm not going to allow this one. . . . I am going to continue to fight. I'm not giving up like I gave up on my other two. I am fighting tooth and nail for him." Mother wanted to continue to work toward getting the child back.

Father testified that Mother told everyone that he was not the father of the child. He explained that Mother told her friends and others that she knew he was not the father, which he tried to stop her from doing. He stated that he and Mother fought because she cheated

on him while she was pregnant, and Father admitted to abusing her. Despite their disagreements in the past, Father testified that he believed Khalil was his child.[4] He explained that he and Mother were together when the child was born: he went to the hospital with her, held her hand when she was giving birth, and stayed in the room with her. After Mother had the child, Father attempted to be nice and tell her that they needed to work together to get their child back. He was tired of fighting with her and realized that he was about to lose his son. They tried working together for a time, but it did not work and they both went their separate ways. Afterward, Father participated in some of his services with Mother, but they were not in a relationship. He explained that they did the parenting education and anger management together, but the rest of the services he completed by himself. He further explained that the reason he participated in the parenting education and anger management with Mother was to attempt to bond with the child. He felt that the child did not want to be around him because the child did not know him. He stated that he "would be all right" if he had Mother with him. Father believed he could not see the child without Mother because the child would cry. According to Father, the child would not cry when Mother was there.

Father stated that he completed all of his classes and all of the requirements on his permanency plan. He saw a psychiatrist, he saw Dr. Berryman for a psychological assessment, and completed anger management and parenting education. He said, "I did everything you-all told me to do." He also was employed; paid his car insurance, car note, phone bill, and child support; and had support and housing. He was currently living in Nashville in a home that belonged to his father figure. He believed he had a home that was appropriate for the child and that he could meet the child's needs financially. He stated that the child would have a room, a bed, and clothes. For these reasons, he stated that he could raise the child. However, he stated that he had been pessimistic about the outcome of this case and did not believe he would get the child back because of the way DCS was treating him.

Father stated that he and Mother participated in several visits together and that having Mother there helped at times. He explained that when he tried to pick up the child when he was crying, the child would fight him or tell Father to put him down. The therapeutic worker gave Father instruction on how to develop his relationship with the child, but Father felt like it did not help. He continued with the visits and did his best to interact with the child by bringing a bookbag with snacks, clothes, and toys. When in-person visitation stopped due to COVID-19, DCS set up virtual visits for Father. However, Father stated that he stopped getting invitations for the virtual visits after he became

___

[4] According to Father's testimony, he thought that he was not the father at the time the child was born, but still signed the birth certificate. He felt that DCS was going to take the child anyway, so it did not make a difference. However, at the time of the hearing, he testified that he believed the child was his. Mother testified that she had no doubt that he was the father, but she explained that Father had expressed doubts that he was the father after they broke up. She also explained that Father did a voluntary acknowledgement by adding his name to the child's birth certificate.

frustrated at one point. He explained that he had to enter a code in order to participate in the virtual visits and was unable to do so. He also explained that he did not like the virtual visits because he could not engage with the child. He said it was difficult for the child and frustrating for him. He testified that even DCS stated that it was difficult to get the two-year-old child to engage in the virtual visits. Despite knowing that DCS was only setting up the virtual visits, he asked to see the child the entire time during the pandemic and was told by DCS that he could not see him in person.

Father testified that he had not seen the child since March 2020. He stated that he had been unable to talk to the child, play with the child, attend the child's birthday parties, and tell the child he loved him. He believed that it was because the foster mother did not want him or Mother around the child. He was upset with DCS and the foster parents because he believed they had taken his child. He originally believed that if he did what DCS asked of him, he could get his child back. However, he felt that they were keeping him away despite everything he had done. He felt like he had done everything he was told to do and that DCS had not done everything they could do to help him. Father also disagreed with what DCS was alleging in their petition and stated that they were saying a person like him could not take care of a child. He wondered how DCS could say such a thing when, in his view, he was never given a chance to raise his child. He felt hurt because DCS took his child away from him knowing that he never really had the child. Father stated that Khalil is his first child and he loves Khalil. He said, "ever since Khalil [was] born, I've been fighting with [DCS] . . . and I'm not giving up."

Ms. Shannon Walls and the foster mother testified on the second day of hearings. Ms. Walls testified as the therapeutic worker from Omni Visions, or the "[f]amily education specialist," who had worked with the family since June 2019. She assisted the parents with services, sought resources that they needed, helped with case management, and supervised visitation. She also provided anger management and parenting education for both parents. She stated that the parents were on the same page as far as parenting, completed their parenting education, and received certificates upon completion of the services. Their parenting curriculum consisted of discussing developmental stages, what was appropriate for the child's age, how to discipline the child, and how to communicate with the child. She also reviewed child nurturing, parent empathy for a child, family roles, and identifying motor skills. At visitation, she sometimes observed Father implement what she taught him from the parenting education. She also stated that the parents learned to soothe the child during visits if he was upset by implementing the skills she taught them. She observed both parents change diapers and feed the child and had no concerns. She did not observe the parents do anything inappropriate toward the child during visitation.

When visitation was in person, visits were usually two times per month for approximately two hours. According to Ms. Walls, this was not a case where missing visits was an ongoing issue. Although they were not a couple at the time, she explained that the parents participated in visits together unless one of them was unable to attend. They

participated in visits regularly until COVID-19 began. While supervising visitations, she would redirect Father if there was an issue and he would comply with her instructions. She explained that she had to redirect Father multiple times regarding his use of inappropriate language in front of the child. She also redirected him if he was having an issue soothing the child when the child was upset. She stated that Mother was able to calm the child when he was crying, but Father felt that the child did not like him and did not know him. She encouraged Father that the child did know him and that he should continue soothing and comforting the child. She had to explain to him that a one-and-a-half-year-old crying did not mean that the child did not like Father. She recalled that Father did well with the child at one particular visit when Mother was unable to attend. Most of the time at visits, the child would be with Mother, but Father interacted with the child periodically by bringing toys and showing videos on his phone. Father would also play ball with the child and bring food that was age appropriate. Furthermore, when she discussed with Father about the need to bring things to the visits like clothes and diapers, he would bring them. In regard to how the child behaved at the visits, Ms. Walls stated that he would cry at the beginning but would warm up to the parents.

Ms. Walls testified that Father only participated in one virtual visit that she was aware of. When she spoke with Father about his lack of participation, he stated that he did not know how to work Zoom and that he struggled with the virtual visits. She informed him that he should contact the FSW. Afterward, she did not speak with him about it because he sent her a text message asking her to stop texting him about the virtual visits. She stated that she stopped texting him and left it in DCS's hands. She explained that during the one virtual visit he participated in, Father did not say anything. However, the child was not communicating with anyone at that point and was not paying attention to the screen. She explained that it was difficult to engage with the child in most of the virtual visits. As for Mother, she consistently participated in the virtual visits. She explained that Mother tried to talk with the child and would do whatever she could to engage with the child. At the time the trial began, Ms. Walls was still doing virtual visits with them. The virtual visits were usually twice a month for 15 to 30 minutes. At the hearing, she noted that her employer had been doing in-person visits in other cases for many months since 2020, but they were waiting for DCS to recommend in-person visits again for this particular case.

Ms. Walls stated that the parents' anger toward each other became an issue during one visit, but noted that they had not completed their parenting education at that time. She explained that Father made a comment that the child was not his and that Mother was with someone else. Ms. Walls informed them that visitation was not the time or place to discuss that or else they would have to end the visit. Afterward, it was not discussed anymore, they were able to continue with the visit, and there were no other issues during the visit. At another visit, the parents were arguing about how to hold the child and Father chose to leave the visit rather than stay and act appropriately. However, the child was never frightened during a visit and the parents never expressed anger or frustration toward Ms.

Walls.  The only issues Ms. Walls encountered at the visits were Father's language and how to soothe the child when he was upset.

The foster mother had fostered the child for approximately three years.  The child was four-days-old when he entered foster care and has been in her home continuously since then.  Therefore, she stated that the child knows no other home than the foster parents' home.  She regularly involved herself in child and family team meetings ("CFTMs") and court hearings.  Outside of CFTMs and court hearings, she only met the parents directly at the child's first medical evaluation a few days after he was born.  During that evaluation, she stated that Father asked if he could hold the child.  The foster parents agreed, but they asked him to wash his hands before holding the child because he was a newborn.  She then explained that Father began to yell, which prompted Mother to yell at Father to try to calm him down.  One of the former FSWs removed herself from the situation, and the foster parents handed the child over to the parents and stepped away.  The former FSW stepped back in and was able to calm the parents down.  Because of this incident, the foster mother did not feel like she could trust DCS to supervise the child with the parents.  She explained that the FSW left her, her husband, and the parents unattended and that she felt like that was not supposed to happen.  As such, she felt like she had to intervene on her own even to the point of staying at some of the visits.  Going forward, she explained that an FSW was not always present for appointments, which was frustrating for her.  She stated that there was another time when the parents became upset at a CFTM and began slamming down on the table and making threats.  One of the former FSWs then spoke to the parents about their behavior and explained to them that they were going to have to leave if they were to continue with the outbursts.

For visitation, the foster mother attempted to talk to the child and prepare him for the visits.  As time passed, the child grew more emotional about visits, and the foster mother would have to let him know it was going to be okay.  She stated that sometimes getting out the door would be a task: there was lots of crying and emotional outbursts that went beyond what was typical for a one-year-old.  At one particular in-person visit, she stated that the therapeutic worker called her within ten minutes of dropping the child off.  The child was screaming and crying in the background, Father was screaming in the background, and the therapeutic worker informed the foster mother that the visit had to be ended.  After the visits, the child's behavior would become worse to the point that she had to call his pediatrician in order to figure out what she could do to calm him down.  She stated that the child would not go to sleep at night and sometimes she would have to stay up at night because he would just continue to cry.

Since COVID-19, the child's behavior was a little different now that he could talk and had more of an understanding.  The child had become more vocal about what he did not want to do and what he did not like.  The child would simply say "no."  She explained that his demeanor would shut down if he knew they were getting ready for a virtual visit.  The foster mother would have to reassure him and do a lot of positive affirmation with him.

- 11 -

She recognized that it was a lot to process for a child who was now three-years-old. She stated that the child did not ask about Mother or Father outside of specific discussions about the visits. She explained that he was getting to the point where if he heard the foster parents discussing any aspects of the case, he did not want them to talk about it, became emotional, and cried. She also explained that the emotional breakdowns usually occurred after the visits, but there were no issues in between the visits. Therefore, she deduced that the child's behavior came from the visits and not some other cause. She understood that the child would have some difficulty transitioning back and forth when he was visiting with his parents, but she believed that his behaviors were directly related to his contact with the parents. She explained that there was fighting and arguing between the parents in front of the child during in-person visits. Moreover, there were a couple of instances where she witnessed Father yelling at the child. Despite her belief, she never implied that the child should not visit with the parents. She testified that she tried her best to handle the situation appropriately to ensure that the visits were going the way they should go.

The foster mother testified regarding the child's development over the past three years. The child's development had been checked, his well-child visits were current, and there were no concerns at the time. There were no delays in his vision or hearing. The foster mother stated that "[h]e [was] right where he [was] supposed to be at three years old." The foster mother explained that the child was a wonderful boy: he was loving, smart, and compassionate. He was attending daycare; receiving love and compassion; and thriving developmentally, socially, and emotionally. The foster parents did a lot of positive affirmations with him by constantly reminding the child that he was handsome, intelligent, and had a purpose. The foster parents set goals for him and were currently working on teaching the child to clean up, make the bed, and pick up toys. The foster mother stated that if the termination was granted, she intended to adopt the child and raise him into a healthy, whole, and productive young man. Even if the court did not find that termination was in the child's best interests, she was willing to keep the child in her home and work with the family.

Dr. Berryman, Ms. Susan Doughty, and Ms. Brizeyea Ramon testified on the third day of hearings. Dr. Berryman was a psychologist who was contacted during this case and asked to evaluate both parents, but she was only able to complete an assessment for Father. She explained that Mother had set up appointments, but Mother came on the wrong day for the first appointment and had to cancel the second appointment. She admitted that she was not as versed in regard to Mother's situation. However, she explained that she was present for both parents' testimony on the first day of the trial. She was also able to review Mother's prior assessments from Athena. In sum, she felt that both parents had to first recognize that they had a problem in order to fix it. However, she also stated that "[t]here are some things that can be fixed more than others." She explained that "[i]ntellectual functioning is pretty concrete, [and] it's not going to change over time." In order to parent their child, she further explained that the parents' commitment to one-on-one parenting instruction and attachment work would be necessary: "I often say many times in a week,

how many psychologists does it take to change a light bulb, only one when the light bulb is going to want to change. Therapy is only as effective as the candidate is willing to work on the therapy."

Dr. Berryman testified regarding her overall assessment of Father's parenting abilities. During his assessment, Father stated that he believed the child did not know him or like him. He also stated that he preferred Mother to be present at the visits and that he had not had much time to spend with the child. Dr. Berryman believed that the child did not have a bond with Father based on Father's description and some paperwork she had reviewed. She even noted that the child's negative reaction from the visits prompted his pediatrician to submit a letter recommending that the visits stop. She also explained that it was a concern that Father had received parenting education but was still making statements that the child did not like him. She stated that Father had a quick temper with potential to express anger and hostility through verbal abuse and social detachment. He also had difficulties socially and with feeling uncomfortable around others, which might lead others to see him as cold and unfeeling. Father may have some personality issues, but Dr. Berryman thought that this was probably due to his IQ level as well as the stress he was under with the termination proceedings. She stated that Father had a grasp of basic parenting skills, but she felt like he needed assistance if he was going to be interacting with the child. She compared him to other low functioning parents that she had dealt with in the past: "There's those that can be a part of their child's life, they just need somebody there to help with . . . what I call the heavy lifting of parenting." As for Mother, she believed that Mother was not in a position to independently parent. Therefore, her recommendations were the same for both parents: more one-on-one parenting and attachment work. She opined that both parents would need continuous parenting instruction during each phase of the child's entire life to be able to parent him through changing developmental stages.

Ms. Doughty testified as the court-appointed special advocate ("CASA") who had been involved with this family since the child was approximately a month old. She explained that her primary goal was to advocate for the child, but she did help the parents when she could. The parents called her a lot for advice or if they did not understand something, but the calls became less frequent as time went on. In the beginning, she was afraid that the parents thought that she was there to advocate for them. Since she did not want them to be confused about her role, she explained to them that she was the child's advocate and that it was her job to make sure that he was cared for as best as he could be. She felt that part of her role as CASA was to attend the visits in order to observe and better understand the case and felt that her presence there was beneficial. Therefore, she was present for a majority of the visits and also attended all of the CFTMs. She believed that her presence there added consistency and stability because she was always a familiar face to both the child and the parents.

Ms. Doughty was unable to verify Father's residence throughout her involvement.

Contrary to Father's testimony, she explained that Father was always moving and was not at the same home. She stated that he was looking at moving into a shelter at one point. When she tried to schedule an appointment with him, sometimes he would not respond and other times he would refuse to tell her where he was living. In regard to his employment, she stated that Father had many jobs over the past three years, but would not maintain his employment for long periods of time. She was present at every CFTM except for one and could not recall if Father ever provided proof of his employment during those meetings. Ms. Doughty stated that she was able to participate in two home visits with Mother in the past. She explained that Mother was neat, clean, and orderly, but the homes she visited were either inappropriate or unsustainable.

Ms. Doughty stated that the parents were doing what they thought they were supposed to do, but they did not always understand why it was not enough. She thought that they did not always understand the message of the permanency plan: not because the message was not there, but because of their ability to understand. She testified that Mother became angry at one point saying she would not let her child be taken from her and did not know if she could go on if that were to happen. She noted that she was concerned that Mother might harm herself depending on the outcome of this case. She concluded that both parents love the child, but they lacked the necessary abilities, resources, and support.[5] She said, "this is an incredibly sad case, it's going on a very long time, you have . . . two people who produced a child and who love that child as they are able but [they] have very, very limited resources to allow them to parent the child as the child needs to be parented." As such, she recommended terminating their parental rights, changing the permanency plan goal to adoption, and allowing the foster parents to adopt the child.

Ms. Ramon testified as the current FSW who became involved with the family in April 2021 just before the trial began.[6] She stated that she had the opportunity to review the case history since she had only been involved since April 2021. When she took over the case, she had a meeting with the previous FSW where they went over the details about the case such as who was involved and the progress on the permanency plan. Since she took over, she had been attempting to work with the parents on the permanency plan, visits, drug screens, and scheduling assessments. In June 2021, she stated that both parents admitted to drug use. After Ms. Ramon called the parents to submit to a drug screen, Mother admitted to using cocaine and Father admitted to using marijuana. Ms. Ramon later completed a drug screen on Mother after a visit, in which Mother tested positive for cocaine. After Father admitted to using marijuana, Ms. Ramon asked him to come in the next day for a drug screen, but he did not. She had been unable to contact him for another

---

[5] Ms. Doughty noted that she had spoken with Father's father figure and mother figure to inquire about how much support they were willing to give. She explained that they were willing to help Father financially with the child, but they were not willing to take the child in their home. She followed up with them later and their position was still the same.

[6] According to the Ms. Doughty's testimony, there were seven different FSWs that worked with this family.

- 14 -

drug screen since then. As a result of the drug use, she submitted referrals for the parents to complete A&D assessments. However, when the time came for the parents to participate in the assessments, she could not get in touch with Mother, and Father refused to complete the assessment.

Ms. Ramon stated that in-person visits resumed after the hearings in April 2021. The visits were once a week for total of about four times a month and each parent had a separate hour for the visit. She stated that both parents had missed or been late a few times to those visits, but the visits were going well and that there were no concerns with the parents. However, she stated that the child was very dysregulated before, during, and after the visits. She explained that the child would not communicate anything verbally to her when she would transport him before and after the visits, but he would cry and seemed nervous. On one particular occasion, the foster mother picked him up from the visit and was able to comfort him. She stated that there were no problems with the parents at the visits, except the fact that Mother tested positive for cocaine after a visit. In regard to housing and employment, she testified that she was unaware of Mother having employment and that it was her understanding that Mother was homeless at the time. As for Father, she testified that she had not seen proof of Father's employment or residence.

On August 2, 2021, the juvenile court entered an order terminating the parental rights of both Mother and Father and a decree of guardianship. The juvenile court found by clear and convincing evidence that three grounds for termination as to both Mother and Father were proven: (1) persistent conditions; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility. The juvenile court also found that termination was in the best interests of the child. Thereafter, both Mother and Father timely filed their appeals.

## II.     ISSUES PRESENTED

Mother and Father present the same issues for review on appeal, which we have slightly restated and consolidated below:

1.  Whether the juvenile court erred in finding clear and convincing evidence to terminate both Mother's and Father's parental rights for the following grounds: (1) persistent conditions; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody or financial responsibility; and
2.  Whether the juvenile court erred in finding that termination of both Mother's and Father's parental rights was in the best interests of the child.

For the following reasons, we reverse the juvenile court's finding of persistent conditions as to Mother and Father, but otherwise affirm the decision of the juvenile court.

## III.     STANDARD APPLICABLE TO TERMINATION CASES

It is well established that "[a] parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the juvenile court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). In regard to conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

On appeal, both Mother and Father present issues challenging all three grounds for the termination of their parental rights. Both Mother and Father also challenge the determination that terminating their parental rights was in the best interests of the child.

## 1. Persistent Conditions

The first ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child."). "The necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL

710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

The child was removed from Mother's and Father's custody on February 1, 2018, when the juvenile court entered a "Non-exigent Removal and Custody Order" awarding temporary custody to DCS. The juvenile court directed DCS to file a "Petition to Adjudicate Dependency and Neglect and for Temporary Legal Custody" and submit a "Protective Custody Order" within two judicial days pursuant to Tennessee Code Annotated Section 37-1-117(b)(2). DCS complied and filed a "Petition for Custody with Request for Emergency Removal and Request to Set for Child Support" on February 5, 2018. In this petition, DCS alleged that the child was dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(B), (F), and (G). Thereafter, the juvenile court entered an emergency protective custody order placing the child in the temporary care and custody of DCS. The juvenile court explicitly found in its order that there was probable cause to believe that the child was dependent and neglected, the child was subjected to an immediate threat, and there was no less drastic alternative to removal available. Additionally, the juvenile court set a preliminary hearing for February 8, 2018. In July 2018, the juvenile court held an adjudicatory hearing on DCS's petition. After the adjudicatory hearing, the juvenile court entered an "Order of Adjudication and Disposition" finding by clear and convincing evidence that the child was dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(F) and (G), and ordered the child to remain in DCS's custody. The juvenile court based its finding on Mother's ongoing pattern of domestic violence and mental health issues and Father's domestic violence with Mother and drug use.

We reiterate that "a threshold requirement for application of this ground is that it be based on an order removing the child that was 'entered at any stage of proceedings in which <u>a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child.</u>'" *In re Jude M.*, 619 S.W.3d 224, 241 (Tenn. Ct. App. 2020) (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added)).[7] The statutory language for this ground plainly states that the order removing the child must be entered during "any stage of proceedings in which a petition has been filed . . . alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). Therefore, we have explained in several cases that this ground applies only when a child has been removed by a court order "as a result of" or "following" a petition alleging a child is dependent and

---

[7] In *In re Jude M.*, we noted that "under the prior version of the statute, which as to this ground governed termination petitions filed prior to July 1, 2018, this ground was applicable only if a juvenile court had adjudicated the child to be dependent and neglected as to the parent or parents whose parental rights were at issue." 619 S.W.3d at 241 n.4; *see In re Audrey S.*, 182 S.W.3d at 876 (reversing the trial court's finding of clear and convincing evidence of the statutory ground of "persistence of conditions" because the juvenile court's order changing custody of the child from the father to the mother "contain[ed] no express judicial finding of dependency, neglect, or abuse, and an order changing custody of a minor child does not necessarily imply such a finding") (citing the version of Tenn. Code Ann. § 36-1-113(g)(3) then in effect).

neglected. *See In re Boston G.*, 2020 WL 2070399, at \*6; *In re D.V.*, 2019 WL 1058264, at \*5; *In re D.T.*, No. E2017-02098-COA-R3-PT, 2018 WL 3020327, at \*4 (Tenn. Ct. App. June 18, 2018). When the child was removed by the "Non-exigent Removal and Custody Order," DCS had yet to file a petition alleging dependency and neglect. Moreover, "proceedings" involving allegations of dependency and neglect had yet to begin. Tenn. Code Ann. § 36-1-113(g)(3)(A). Accordingly, we conclude that the threshold requirement for application of this ground had not been met and reverse the juvenile court's conclusion that DCS met its burden of proof on the ground of persistent conditions as to Mother and Father.

## 2. Mental Incompetence

The second ground for termination at issue on appeal is mental incompetence. This ground for termination applies when:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent . . . is *mentally incompetent* to provide for the further care and supervision of the child, and to terminate that parent's . . . rights to the child;
>
> (B) The court may terminate the parental . . . rights of that person if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent . . . the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii) That termination of parental . . . rights is in the best interest of the child;
>
> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated[.]

Tenn. Code Ann. § 36-1-113(g)(8) (emphasis added). We have explained in prior cases that:

> [t]he standard for this issue has been described as inquiring as to whether "by clear and convincing evidence [ ] the parent of the child is incompetent to

- 19 -

adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed.* This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

*In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *6 (Tenn. Ct. App. July 21, 2021) (quoting *In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *9 (Tenn. Ct. App. Apr. 19, 2017)). To meet the burden for this ground, DCS must "demonstrate two essential facts: (1) that Mother [and Father are] *presently* unable to care for the subject child[ ] and (2) that Mother [and Father are] *unlikely to be able to care for the child[ ] in the near future.*" *In re David J.B.*, No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App. July 23, 2010) (citing Tenn. Code Ann. § 36-1-113(g)(8) (2010) (emphasis added)).

Dr. Berryman was asked to evaluate both parents in this case, but she was only able to complete an assessment for Father. In her report following Father's assessment, she stated that her diagnostic impressions of Father were "[m]ild to moderate intellectual disability" and "[d]epressive disorder from prior evaluation." She explained that he had some intellectual limitations that fell within the mild category. She was concerned that there was not just an absence of a positive bond between him and the child, but that there was a negative bond. Father had a quick temper with potential to express anger and hostility through verbal abuse and social detachment. He had difficulties socially and with feeling uncomfortable around others. She also thought that Father may have some personality issues, most likely due to his IQ level and the stress he was under with the termination proceedings. While she noted that Father was able to live independently, she recommended that Father would need assistance if he were to have any type of visitation with the child because of "intellectual deficits."

Despite not completing an assessment for Mother, she was present for both parents' testimony on the first day of the trial and was also able to review Mother's assessments from Athena. In the report from her assessment in November 2019, Mother was diagnosed with "[m]ajor depressive disorder, moderate, recurrent, with anxious distress[.]" In a prior assessment from 2012 involving her second child, she was diagnosed with unspecified anxiety disorder and mild intellectual disability with an overall IQ score of 59. From her review of Mother's records, she found that there was some concern about Mother's understanding of appropriate physical discipline, which "raised a flag." She stated that if Mother's mental health was not addressed, that would affect her ability to parent and

understand how to parent properly. She also stated that if Mother was not consistently staying on her medication, that would affect her ability to parent as well. Ultimately, she believed that Mother was not in a position to independently parent.

Dr. Berryman concluded that both parents would need continuous parenting instruction during each phase of the child's entire life to be able to parent him through changing developmental stages. In light of Dr. Berryman's testimony, we find that both Mother and Father (1) "are *presently* unable to care for the subject child[ ]" and (2) "*unlikely to be able to care for the child*[ ] *in the near future.*" *In re David J.B.*, 2010 WL 2889265, at *7 (citing Tenn. Code Ann. § 36-1-113(g)(8) (2010) (emphasis added)). Despite their efforts, there was still uncertainty as to whether either parent was fit to parent this child. At the time of the trial, the parents were unable to care for Khalil according to Dr. Berryman. Going forward, both parents would need continuous instruction in order to parent their child.

This Court has analyzed prior cases involving mental incompetence. In *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *17 (Tenn. Ct. App. Sept. 27, 2013), the experts opined that the parents "could learn to competently parent with intensive, long-term intervention." We concluded that the evidence did not support the trial court's finding that the parents were mentally incompetent to provide for the further care and supervision of their children. *Id.* We also followed that reasoning in *In re Cyric W.*, No. M2021-00410-COA-R3-PT, 2021 WL 5881753, at *24 (Tenn. Ct. App. Dec. 13, 2021), where we held that it was likely that the mother's mental condition could improve with appropriate treatment. In contrast, we have held that termination is appropriate when expert testimony demonstrated that a parent's mental disability was a "lifelong condition," and that "no amount of training education, or counseling 'could bring [the parent] up to the level where he [or she] could parent'" a child. *In re Dyllon M.*, No. E2020-00477-COA-R3-PT, 2020 WL 6780268, at *10 (Tenn. Ct. App. Nov. 18, 2020) (quoting *Mims*, 285 S.W.3d at 449).

Here, the expert testimony concluded that both parents would need consistent parenting instruction during each stage of the child's lifetime. The child's needs are going to change over his lifetime, but the parents' "[i]ntellectual functioning is pretty concrete, [and] it's not going to change over time." As such, we conclude that it is unlikely that either parent will be able to care for Khalil in the near future without continuous parenting instruction. We affirm the juvenile court's conclusion that DCS met its burden of proof on the ground of mental incompetence.

### 3. Failure to Manifest an Ability & Willingness to Parent

The final ground for termination exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal

and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). There are two elements necessary to prove for this statutory ground. *In re Neveah M.*, 614 S.W.3d at 674. The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest either ability or willingness" satisfies the first element of this ground. *Id.* (adopting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is assessed based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

Again, the child was removed from the custody of his parents in February 2018 based on substantial risk of harm. More than a year and a half later, the parents did not have the ability to assume custody of the child when the petition for termination was filed. We note at the outset that both parents put the blame on others for their situation. Mother believed that the foster parents were partly responsible for taking her child away, but she mainly held the maternal great-grandmother responsible. Father faulted others for not having his child back and believed he had done everything DCS asked him to do.

Not only did Mother not have a suitable home of her own at the time, but she was also homeless and was reportedly living in a tent until she was able purchase a motel room after receiving her stimulus check. She admitted to drug use and tested positive for cocaine in June 2021. She then failed to participate in an A&D assessment. Additionally, there was no proof of her having any employment. As for Father, he was reportedly homeless and sleeping in his car at the time the petition was filed. Although Father was paying child support out of his social security check, there was no proof of Father's employment or residence at the time of the trial. Like Mother, Father also admitted to drug use in June 2021, and then he failed to submit to a drug screen and failed to participate in an A&D assessment. The parents made strides in their parenting education, but it was recommended that they would need continuous instruction throughout each stage of the child's lifetime. While both parents may love the child, they ultimately lacked the necessary ability to assume custody or financial responsibility of the child.

Since the child was removed from the parents' custody, the parents have failed to alleviate the concerns of the risk of substantial harm to the welfare of the child. Not only are there still concerns about their ability to parent this child, but the parents' circumstances demonstrate that placing this child in their custody would pose a risk of substantial harm to the child. The parents housing and employment status remained a concern and the parents admitted to drug use in June 2021. Therefore, we affirm the juvenile court's conclusion that DCS met its burden of proof on this ground.

## B. Best Interests of the Child

We now review whether termination of the parental rights of both Mother and Father was in the best interests of the child. This Court "must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the child's best interests from the child's perspective rather than the parents' perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. April 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

The first statutory factor is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . [.]" Tenn. Code Ann. § 36-1-113(i)(1). Both parents completed their requested parenting and psychological assessments. As a result of these assessments, they then participated in and completed parenting education and anger management. Father also completed his recommended psychotherapy sessions and an additional psychological assessment with Dr. Berryman in April 2021. Despite their participation in these services, their ability to parent this child remained a concern. The parents implemented skills at visitation that they learned from their parenting education, but more one-on-one parenting and attachment work was still recommended. There was a question of whether the parents would be able to ever progress beyond supervised visitation with the child. Furthermore, the parents' housing and employment situation remained a concern as well. The parents added to these concerns by admitting to drug use in June 2021 while the trial was still ongoing. Mother then submitted to a drug screen and tested positive for cocaine. Father admitted to using marijuana, but failed to submit to a drug screen. We find that this factor weighs in favor of termination as to both Mother and Father.

The second statutory factor is "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(2). The parents completed many services requested by DCS, but they remained in a position where they were still unable to independently parent this child because they would need continuous assistance and instruction going forward. Based on the parents' circumstances, a lasting adjustment does not reasonably appear possible. DCS arranged several services for the parents to participate in: parenting education, anger management, and therapeutic visitation. Additionally, DCS also developed permanency plans and held CFTMs. After the parents both admitted to drug use in June 2021, the FSW sent in referrals so that the parents could participate in A&D assessments. However, the FSW was unable to get in touch with Mother and was told by Father that he was refusing to complete any further assessments. Despite these efforts by DCS, both parents put the blame on others for their situation. We find that this factor weighs in favor of termination as to both Mother and Father.

The third statutory factor is "[w]hether the parent . . . has maintained regular visitation or other contact with the child[.]" Tenn. Code Ann. § 36-1-113(i)(3). The parents participated in in-person visitation until March 2020, which was usually two times per month for approximately two hours. Mother consistently participated in the virtual visits during COVID-19, but Father only participated in one because he was frustrated and upset that he did not get to engage with the child. Father asked to see the child in person the entire time during the pandemic and was told by DCS that he could not see him. Therefore, at the time of his testimony in April 2021, Father had not seen the child since March 2020. When the therapeutic worker spoke with Father about his lack of participation, he sent her a text asking her to stop texting him about the virtual visits. In-person visits resumed after the hearings in April 2021. Both parents had missed or were late a few times to those visits, but the visits were going well and there were no concerns with the parents. Overall, we find that this factor weighs against termination as to Mother, but we find that it weighs in favor of termination as to Father.

The fourth statutory factor is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). The child was removed from the parents' custody when he was just a few days old and remained in foster care since then. Thus, the child knows no other home than the home of the foster parents. According to the foster mother's testimony, the child did not ask about Mother or Father outside of specific discussions about the visits. Dr. Berryman believed that the child did not have a bond with Father. Even Father felt that the child did not want to be around him because the child did not know him. The child became visibly upset and had emotional breakdowns before and after visits. It is clear the parents love the child, but there is an absence of a meaningful relationship between the child and his parents. Therefore, we find that this factor weighs in favor of termination as to both Mother and Father.

- 24 -

The fifth statutory factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.]" Tenn. Code Ann. § 36-1-113(i)(5). The child was four-days-old when he entered foster care, has been in the foster parents' home continuously since then, and knows no other home than the foster parents' home. He was thriving in his current situation and "[was] right where he [was] supposed to be at three years old." The child suffered from crying spells and nervousness—that sometimes escalated into emotional breakdowns—when having to engage in visitation with Mother and Father, but he was able to be comforted by the foster mother afterwards. Therefore, we find that this factor weighs in favor of termination as to both Mother and Father.

The sixth statutory factor is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). The parents had a history of domestic violence. Father had been arrested in the past for physically abusing Mother while she was pregnant. There were also instances where the foster mother witnessed Father yelling at the child during visitation. Additionally, Mother had a history of not being able to provide for her previous children, in addition to instances of both neglect and physical abuse. Based on the parents' history of domestic violence, Father's physical and verbal abuse of Mother, and Mother's history with her first two children, we find that this factor weighs in favor of termination as to both Mother and Father.

The seventh statutory factor is "[w]hether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent[s] consistently unable to care for the child in a safe and stable manner[.]" Tenn. Code Ann. § 36-1-113(i)(7). At the time DCS filed its petition, Mother was currently renting a room in a halfway house and Father was currently homeless and sleeping in his car. Mother ended up on the streets afterward and lived in a tent for a time. She was staying in a motel room at the time of her testimony, but she stated that she was technically homeless at the time. At the time of trial, the FSW had not seen proof of Father's residence. When the CASA tried to schedule an appointment with him, sometimes he would not respond and other times he would refuse to tell her where he was living. The CASA was able to complete two home visits with Mother when she had a home. However, the homes she visited were either inappropriate or unsustainable. Furthermore, the FSW stated that the parents admitted to drug use in June 2021 while the trial was still ongoing. Both parents failed to participate in an A&D assessment afterward. We find that this factor weighs in favor of termination as to both Mother and Father.

The eighth statutory factor is "[w]hether the parent's . . . mental health and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively

- 25 -

providing safe and stable care and supervision for the child[.]" Tenn. Code Ann. § 36-1-113(i)(8). As we have already established, the parents were unable to presently care for Khalil according to Dr. Berryman. They would need continuous instruction going forward due to their mental capacity, which affected their ability to understand how to properly parent their child. As such, the parents' mental capacity would be detrimental to the child and would prevent them from effectively providing safe and stable care and supervision for the child. *Id.* We find that this factor weighs in favor of termination as to both Mother and Father.

The ninth statutory factor is "[w]hether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). Father testified that he paid child support out of his social security check. He stated that he had paid "child support ever since Khalil was born" and paid every month. He even submitted into evidence a social security form that showed the $151.00 deduction for child support. While there was testimony and evidence concerning Father's payment of child support, there was no testimony or evidence concerning Mother's payment of child support. DCS conceded to this in its appellate brief. Therefore, we find that this factor weighs against termination as to Father and is neutral as to Mother.

After reviewing the statutory factors found in Tennessee Code Annotated § 36-1-113(i), we conclude that the juvenile court properly determined that termination of the parental rights of both Mother and Father was in the best interests of the child.

## V.    CONCLUSION

For the aforementioned reasons, we reverse the juvenile court's finding of persistent conditions as to Mother and Father, but otherwise affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellants, Dusty L. H. and Henry D. J., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE